**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Blackhawk Network Incorporated, | No. CV-21-00813-PHX-MTL |
| Plaintiff, | **ORDER** |
| v. | |
| SL Card Company Incorporated, et al., | |
| Defendants. | |

Plaintiff Blackhawk Network Inc. ("Blackhawk") brings this action against Defendants SL Card Company Inc. ("SL Card"), Interactive Communications International ("ICI"), e2Interactive Inc. ("e2"), Linq3 Technologies LLC ("Linq3"), and L3 Innovations LLC ("L3"), asserting claims under the Patent Act, 35 U.S.C. § 256, and Arizona contract law. (Doc. 46.) Defendants move to dismiss Plaintiff's claims for lack of subject matter jurisdiction, lack of personal jurisdiction, and failure to state a claim upon which relief may be granted. (Docs. 58, 59.) Defendants' motions are fully briefed (Docs. 63, 64, 69, 70). For the reasons that follow, the Court will grant both motions and dismiss for lack of subject matter jurisdiction.

## I.    BACKGROUND

Blackhawk is the nation's largest distributor of third-party branded gift cards. (Doc. 46 ¶ 58.) As such, Blackhawk distributes gift cards from hundreds of brands (e.g., Barnes & Noble, Gap, Lowes, and Panera) to various retail locations across the country (e.g., Albertsons, Food Lion, Kroger, and Safeway) to be sold to consumers. (*Id.* ¶ 59.)

Blackhawk's service enables retailers to attract consumers by offering a broad range of branded gift cards in a single location and enables consumers to conveniently purchase branded gift cards at a local location without having to make a special trip. (*Id.* ¶¶ 60–61.)

In addition to distributing gift cards, Blackhawk operates a computer network through which it receives and acts on its retailers' requests to activate Blackhawk-distributed gift cards. (*Id.* ¶ 60.) When a consumer purchases a gift card at one of its partner's locations, an activation request is sent to Blackhawk. (*Id.*) Blackhawk then sends the request to a card processor who maintains the account associated with the gift card. The card processor then activates the account and sends a confirmation back to Blackhawk. Finally, Blackhawk sends the confirmation back to the retailer, at which point the gift card is activated and can be used by the consumer. (*Id.*)

Several years ago, Blackhawk began using its computer and distribution networks to sell lottery products, in addition to gift cards. (*Id.* ¶ 62.) Traditionally, lottery products were available in retail stores only at specialized kiosks with a lottery terminal. Since most retailers had just one kiosk, consumers often had to wait in line to purchase their tickets and, even once they purchased their tickets, consumers had to wait for the tickets to print. (*Id.*)

In an effort to remedy these outdated shortcomings and provide a more convenient experience for consumers, the Ontario Lottery and Gaming Corporation ("Ontario Lottery") developed a product that would allow consumers to purchase pre-printed lottery tickets at retail locations and have the tickets activated and entered into lottery drawings directly at the point of sale, much like a branded gift card. (*Id.* ¶¶ 62–64.) Ontario Lottery referred to this new product as "QuickTicket." (*Id.* ¶ 63.) Ontario Lottery filed a Canadian patent application for QuickTicket that issued as Canadian Patent Number 2,855,434 (the "434 Patent"). (*Id.* ¶ 65.) The 434 Patent named Ontario Lottery employee Gino Giunti as sole inventor. (Doc. 58 at 5.) Ontario Lottery also filed for and received a Canadian Trademark registration for the mark "QuickTicket." (*Id.* at 5–6.)

Blackhawk acquired the 434 Patent from Ontario Lottery in March 2016 and, six

months later, in September 2016, acquired Ontario Lottery's analogous U.S. patent application, which subsequently issued as U.S. Patent Number 9,865,135 (the "135 Patent"). (Doc. 46 ¶ 65.) The 135 Patent claimed priority to the 434 Patent and also named Ontario Lottery employee Gino Giunti as sole inventor. (Doc. 58 at 5.) Two years later, in April 2018, Blackhawk filed a continuation application that issued as U.S. Patent Number 10,769,894 (the "894 Patent") and again named Giunti as sole inventor (the 135 and 894 Patents are collectively referred to as the "Blackhawk Patents"). (Doc. 5 at 5.)

The Blackhawk Patents are each entitled "Methods for Selling Pre-Printed Online Lottery Tickets." (Doc. 46 ¶ 67.) The patents describe two distinct QuickTicket embodiments: (i) "pre-printed lottery tickets that do not have a draw date or wager (i.e., lottery numbers) assigned or associated to the pre-printed ticket" ("Unnumbered Draw Tickets") and (ii) "pre-printed tickets with pre-printed wagers on the ticket" ("Numbered Draw Tickets" or "QuickTicket V2"). (Id. ¶¶ 68–72.) Although both Patents describe and provide examples of both embodiments, only the 894 Patent has claims directed to QuickTicket V2.[1] (Id. ¶ 73.)

On January 1, 2017, Defendants SL Card and L3 entered into a Product Distribution Agreement ("Distribution Agreement") with Blackhawk to have Blackhawk distribute their lottery products to Blackhawk's U.S. retailers.[2] (Doc. 46 ¶ 76; see Doc. 47.) Both Blackhawk and SL Card are Arizona corporations. (Doc. 46 ¶¶ 18, 20.) L3 is a Delaware entity headquartered in Atlanta, Georgia. (Id. ¶ 22.) Before March 2019, L3 operated under the name Linq3 Technologies LLC, and owned all of SL Card's outstanding shares of stock.[3] (Doc. 58 at 3.) The Distribution Agreement was principally

---

[1] On September 12, 2020, ICI filed two petitions for post-grant review of the 894 Patent at the Patent Trial and Appeal Board of the U.S. Patent and Trademark Office. See Nos. PGR2020-00084 and PGR2020-00085. See Exs. 24 (Petition for Post Grant Review, No. PGR2020-00084) & 25 (Petition for Post Grant Review, No. PGR2020- 00085).
[2] The Distribution Agreement states that it is between "Blackhawk Network, Inc., an Arizona corporation ('Blackhawk'), SL Card Company Inc., an Arizona corporation ('Linq3') . . . and, for purposes of Sections 15.1 and 21.12 hereof, Linq3 Technologies LLC, a Delaware limited liability company and the owner of all the issued and outstanding capital stock of Linq3 ('Linq3 Technologies')." (Doc. 47.)
[3] This Linq3 Technologies LLC, a Delaware entity, should not be confused with Defendant Linq3 Technologies LLC, which is a Florida entity that was formed in 2019 under the name Linq3 Acquisition LLC. (Doc. 58 at 3–4.)

centered on a lottery product called "Play Now." (Doc. 46 ¶¶ 76–77.) Play Now was described in the Distribution Agreement as a "consumer solution for real-time, ticketless lottery transactions." (*Id.* ¶ 78.) To use the product, consumers would purchase a Play Now lottery card—as opposed to a lottery ticket—that would be scanned at checkout to be activated. (Doc. 59 at 6.) Consumers would then text a code located on the card to the lottery to receive lottery numbers on their mobile phones for the next draw. (*Id.*)

Play Now was launched in 2017 under the name "Lottery Card" in Ohio, Georgia, and Kentucky. (Doc. 46 ¶ 76.) Shortly after the product's launch, Blackhawk and L3 approached the Texas State Lottery Commission about introducing Play Now in Texas. (*Id.* ¶ 97.) The Commission informed them that because lottery play was not permitted on mobile devices in Texas, Play Now could not be sold there. (*Id.*) Eager to capitalize on the lucrative Texas lottery market, Blackhawk suggested to L3 that QuickTicket, which did not require the use of a mobile device, and which Blackhawk was already distributing in Canada for Ontario Lottery, might provide a viable solution in Texas and other states with similar rules regarding mobile devices. (*Id.* ¶¶ 97–98.) On December 13, 2017, Blackhawk gave L3 a PowerPoint presentation about QuickTicket. (*Id.* ¶ 98.) The presentation, which was marked "confidential," described both QuickTicket embodiments (Numbered and Unnumbered Draw Tickets), highlighted QuickTicket's unique features, and detailed the QuickTicket purchase flow. (*Id.* ¶¶ 98–103.) The presentation also included several images of QuickTicket products. (*Id.*) After the presentation, Blackhawk employee Ryan Koop sent L3 personnel a copy of the slide deck that was used during the presentation. (*Id.* ¶ 104.)

Several months later, in May 2018, Blackhawk and L3 personnel again met to discuss products that could be marketed to the Texas Lottery Commission. The Commission had by then expressed interest in an "in-lane" lottery product—one that consumers could purchase in an ordinary checkout lane, rather than a dedicated lottery kiosk. (*Id.* ¶ 105.) At the meeting, Blackhawk again suggested that QuickTicket V2, a "new version of [Blackhawk's] [l]ottery [p]roduct in Canada," "might be [a] good fit[] for . . . TX." (*Id.* ¶ 106.) L3 agreed, and the companies decided to pitch QuickTicket to the

Texas Lottery Commission. They did so on June 18, 2018. (*Id.* ¶¶ 108–09.) The pitch was successful, and the companies worked to prepare QuickTicket for sale in Texas and other states, including Arizona. This work included: (1) interfacing with the Texas Lottery's intermediary, IGT; (2) ensuring QuickTicket met the necessary technical and security specifications to work properly; and (3) creating the look of the final, saleable product. Blackhawk and L3 also negotiated with the Texas Lottery and retailers on pricing. (*Id.* ¶ 110)

On November 20, 2017, before Blackhawk had given L3 the presentations describing QuickTicket, L3 filed U.S. Patent Application Number 15/818,569 (the "569 Application"). (*Id.* ¶ 111.) The 569 Application was directed at the Play Now product and said nothing about physical lottery tickets that consumers could purchase at retail locations. (*Id.*) On June 18, 2018, the same day Blackhawk and L3 pitched QuickTicket to the Texas Lottery Commission, L3 filed, without Blackhawk's knowledge, U.S. Patent Application Number 16/010,398 (the "398 Application"), a continuation-in-part of the 569 Application. (*Id.* ¶ 112.) The 398 Application added "nearly 10 new drawings, and approximately six additional columns of information, and disclosed new embodiments including a physical lottery ticket—none of which had been disclosed in the [569 Application] or any other application in the family history of the [398 Application]." (*Id.*) The Complaint alleges that these new disclosures and embodiments constitute "stolen patent rights" based on Blackhawk's pre-existing intellectual property—the 135 and 894 Patents. (*Id.* ¶ 154.)

The 398 Application issued on March 12, 2019, as U.S. Patent Number 10,229,561 (the "561 Patent"). (*Id.* ¶ 118.) While the 398 Application was pending, on August 22, 2018, L3 filed another application, U.S. Patent Application Number 29/660,720 (the "720 Application"), that claimed the benefit of the 398 Application. The 720 Application issued as U.S. Patent Number D877,812 on March 10, 2020 (the "812 Patent"). (*Id.* ¶ 116.) These two patents—the 561 and 812 Patents, are the subject of the instant action.

Defendant ICI is a Florida corporation and wholly owned subsidiary of HI Technology Corp, a Georgia corporation ("HITC"). (Doc. 58 at 3.) The HITC umbrella

1    consists of dozens of entities, including both direct and indirect subsidiaries, that are
2    generally referred to by the trade name "InComm." (*Id.* at 3.) One such company is
3    Defendant e2, a direct HITC subsidiary, that was formed to hold the intellectual property
4    used by the InComm Family of entities. (*Id.*) HITC, ICI, and e2 are all headquartered in
5    Atlanta, Georgia. (*Id.*) InComm, like Blackhawk, is a leading provider of prepaid and
6    stored-value products and payment system solutions (e.g., gift cards, financial services
7    cards, etc.). (*Id.*) Blackhawk and InComm are direct competitors.

8         In February 2019, Defendant Linq3 was formed in Florida under the name Linq3
9    Acquisition LLC, for the purpose of acquiring some of L3's assets, including L3's patents,
10   patent applications, and ownership interest in Defendant SL Card. (*Id.* at 3–4.) Linq3 was
11   and remains a subsidiary of PRE Solutions, Inc., which is in turn a subsidiary of PRE
12   Holdings, Inc., a direct HITC subsidiary. (*Id.* at 4.) After the acquisition, L3 changed its
13   name from Linq3 Technologies LLC to L3 Innovations LLC and ceased its business
14   operations, Linq3 Acquisition LLC changed its name to Linq3 Technologies LLC,
15   and Linq3 assigned the patent applications it acquired from L3 to e2. (*Id.*)

16        Blackhawk initiated this action on May 6, 2021. (Doc. 1.) Blackhawk alleges that
17   Defendants stole its intellectual property by filing patents claiming QuickTicket V2, an
18   invention claimed in the Blackhawk Patents and disclosed to Defendants SL Card and L3
19   in confidence pursuant to the parties' contractual agreement. (Doc. 63 at 6.)  Blackhawk
20   seeks: (1) to have Gino Giunti and/or one or more Blackhawk employees named as
21   inventors on the 561 and 812 Patents; (2) sole ownership of the 561 and 812 Patents; (3)
22   injunctive relief prohibiting Defendants from using QuickTicket or claiming QuickTicket
23   in any future patent applications; and (4) injunctive relief enforcing the terms of the
24   Distribution Agreement. (Doc. 46 at 65–66.) Defendants seek to dismiss Blackhawk's
25   claims for lack of subject matter jurisdiction, lack of personal jurisdiction, and failure to
26   state a claim upon which relief may be granted under Federal Rule of Civil Procedure
27   12(b)(1), (b)(2), and (b)(6). (Docs. 58, 59.) Because the Court concludes that it lacks
28   subject matter jurisdiction over all of Blackhawk's claims and dismissal under Rule

12(b)(1) is warranted, the Court will not address Defendants' Rule 12(b)(2) and (b)(6) arguments.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(1) authorizes a court to dismiss claims over which it lacks subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). Issues of standing are properly raised in a motion to dismiss under Rule 12(b)(1). *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). "When the motion to dismiss attacks the allegations of the complaint as insufficient to confer subject matter jurisdiction, all allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party." *Renteria v. United States*, 452 F. Supp. 2d 910, 919 (D. Ariz. 2006) (citing *Fed'n of African Am. Contractors v. City of Oakland*, 96 F.3d 1204, 1207 (9th Cir. 1996)).

Federal courts are courts of limited jurisdiction. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). "It is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Id.* (citations omitted). Thus, on a motion to dismiss based on lack of standing, the party invoking federal jurisdiction bears the burden of establishing the elements of Article III standing. *See Spokeo v. Robins*, 578 U.S. 330, 338 (2016). "Where, as here, a case is at the pleading stage, the plaintiff must 'clearly . . . allege facts demonstrating' each element." *Id.* (alteration in original) (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).

## III.    DISCUSSION

### A.    Section 256 Claims

Article III authorizes federal courts to resolve only "cases" and "controversies." U.S. Const. art. III, § 2. "To state a case or controversy under Article III, a plaintiff must establish standing." *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 133 (2011). Thus, whether a plaintiff has standing presents a "threshold question in every federal case [because it determines] the power of the court to entertain the suit." *Warth*, 422 U.S. at 490. To establish Article III standing, a plaintiff must show: "(1) it has suffered an 'injury

in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000).

Defendants allege that Blackhawk lacks standing to pursue its claims for correction of inventorship under 35 U.S.C. § 256.[4] (Doc. 58 at 7–10; Doc. 59 at 6–7.) Section 256 reads:

> Whenever through error a person is named in an issued patent as the inventor, or through error an inventor is not named in an issued patent, the Director may, on application of all the parties and assignees, with proof of the facts and such other requirements as may be imposed, issue a certificate correcting such error.
>
> The error of omitting inventors or naming persons who are not inventors shall not invalidate the patent in which such error occurred if it can be corrected as provided in this section. The court before which such matter is called in question may order correction of the patent on notice and hearing of all parties concerned and the Director shall issue a certificate accordingly.

35 U.S.C. § 256. As interpreted by the Federal Circuit, section 256 "provides a cause of action to interested parties to have the inventorship of a patent changed to reflect the true inventors of the subject matter claimed in the patent." *Fina Oil & Chem. Co. v. Ewen*, 123 F.3d 1466, 1471 (Fed. Cir. 1997); *see also Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1356 n.1 (Fed. Cir. 2004) ("A person who alleges that he is a co-inventor of the invention claimed in an issued patent who was not listed as an inventor on the patent may bring a cause of action to correct inventorship in a district court under 35 U.S.C. § 256.").

Patent inventorship and ownership are distinct concepts. *Beech Aircraft Corp. v. EDO Corp.*, 990 F.2d 1237, 1248 (Fed. Cir. 1993). "[I]nventorship is a question of who actually invented the subject matter claimed in a patent. Ownership, however, is a question

---

[4] Because the Declaratory Judgment Act does not by itself confer federal subject matter jurisdiction, *Nationwide Mut. Ins. Co. v. Liberatore*, 408 F.3d 1158, 1161 (9th Cir. 2005), Blackhawk's claims for declaratory relief do not "arise under" federal law for jurisdictional purposes.

of who owns legal title to the subject matter claimed in a patent, patents having the attributes of personal property." *Id.* Nevertheless, "[a]t the heart of any ownership analysis lies the question of who first invented the subject matter at issue, because the patent right initially vests in the inventor who may then, barring any restrictions to the contrary, transfer that right to another." *Id.* Thus, Blackhawk, in seeking to correct inventorship on Defendants' patents, also seeks to be named at least a co-owner of those patents. (Doc. 46 at 65–66.)

To establish injury-in-fact under section 256, a plaintiff must allege facts demonstrating that it has a "concrete financial interest" or a "particularized reputational" interest in the patent at issue. *See Chou v. Univ. of Chi.*, 254 F.3d 1347, 1358–59 (Fed. Cir. 2001); *Shukh v. Seagate Tech., LLC*, 803 F.3d 659, 663 (Fed. Cir. 2015); *Larson v. Correct Craft, Inc.*, 569 F.3d 1319, 1326 (Fed. Cir. 2009). *Chou* is illustrative. In that case, the plaintiff, a graduate student and research assistant, alleged that her name had been improperly omitted from several patents and sought correction of inventorship under section 256. *Chou*, 254 F.3d at 1353. Although the terms of her university employment contract required that she assign her inventions to the university, Chou argued she had standing because, if named as an inventor, she would be entitled under university policy to royalties, licensing revenue, and equity in start-up companies. *Id.* at 1355. The Federal Circuit agreed and held that Chou's financial interest in the patents, while less than an ownership interest, was sufficiently concrete to grant her standing to assert a section 256 claim. *Id.* at 1358–59.

The Federal Circuit reached the opposite conclusion in *Larson*. 569 F.3d 1319. There, the plaintiff, a draftsman who designed boat components, assigned all his rights in the contested patents to his employer. *Id.* at 1322. Years later, when he "discovered his rights" as an inventor, he brought an action to correct inventorship under section 256. *Id.* at 1321–22. The court determined that Larsen lacked standing, because he had "affirmatively transferred title to the patents to [his employer], and he [stood] to reap no benefit from a preexisting licensing or royalties arrangement." *Larson*, 569 F.3d at 1326.

Thus, naming him as an inventor on the disputed patents would have provided him no redress. *See Informatics Applications Grp., Inc. v. Shkolnikov*, No. 1:11-cv-726, 2011 WL 4804870, at *5 (E.D. Va. Oct. 11, 2011). Together, *Chou* and *Larson* illustrate that in order to have standing to pursue a section 256 claim, a plaintiff must have an actual, concrete interest in the challenged patent. Absent such an interest, any alleged error in the patent's stated inventorship inflicts merely abstract, hypothetical injury. And such injury is insufficient to invoke federal jurisdiction under Article III.

In the instant case, Blackhawk petitions the Court to correct inventorship on the 561 and 812 Patents to indicate that Gino Giunti and one or more Blackhawk employees are "at least joint inventor[s]" of the patents. (Doc. 46 ¶¶ 156, 177.) Blackhawk argues it has standing to asserts its section 256 claims for two independent reasons. "First, Blackhawk has standing with respect to inventorship claims on behalf of Gino Guinti based upon his assignment to Blackhawk. Second, Blackhawk has standing with respect to inventorship claims on behalf of other Blackhawk employees, like Ryan Koop." (Doc. 63 at 18.) The Court will consider each argument in turn.

### 1.      Assignment from Gino Giunti

Blackhawk contends that it has standing to assert its section 256 claims based on the rights it was assigned by Gino Giunti. (Doc. 63 at 19–20.) In response, Defendants argue Blackhawk has not alleged facts sufficient to establish injury-in-fact on its section 256 claims because, even accepting the allegations in the Second Amended Complaint as true, Giunti lacks standing to bring a section 256 claim on his own behalf. (Doc. 76.) Thus, even if he assigned Blackhawk the right to seek correction of inventorship on his behalf, Blackhawk lacks standing to do so. (*Id.*) Further, according to the Second Amended Complaint, Giunti assigned Blackhawk only his rights under the 135 Patent and "related patents and applications." (Doc. 58 at 9.) Thus, because Defendants' patents are not "related" to the 135 Patent under the terms of the Assignment Agreement, Blackhawk has no standing to challenge Defendants' patents based on the agreement. (*Id.*)

Giunti is not now, and has never been, a Blackhawk employee. (Doc. 46 ¶ 165.)

The assignment of his patent rights to Blackhawk is governed exclusively by the Assignment Agreement he and Blackhawk executed on August 30, 2016. (Doc. 58-1 at 155–60.) In the agreement, Giunti assigned Blackhawk the provisional and utility applications that issued as the 135 Patent and

> all patents that issue from or claim priority to such patent applications, and all continuations, continuations-in-part, divisionals, extensions, substitutions, reissues, re-examinations, foreign equivalents, and renewals, of any of the foregoing, and any patents or patent applications from which any of them claim priority or that claim priority from any of them.

(Doc. 58-1 at 157.) With respect to those patents and applications, Giunti assigned Blackhawk:

> All rights, privileges, and protections of any kind whatsoever of Assignor accruing under any of the Assigned Patents. . . .
>
> . . . .
>
> All rights to any and all claims and causes of actions, with respect to any of the Assigned Patents, whether accruing before, on or after the Effective Date, including all rights to and claims for damages, restitution and injunction and other legal and equitable relief for past, present and future infringement, misappropriation, violation, misuse, breach or default, with the right but no obligation to petition or sue for, or otherwise seek, such legal and equitable relief and to collect, or otherwise recover, any such damages.

(*Id.*)

Blackhawk seeks to have Giunti named as a joint inventor on the 561 and 812 Patents. (Doc. 46 ¶¶ 156, 165.) A person can qualify as a joint inventor "only if he contributes to the conception of the claimed invention." *Eli Lilly*, 376 F.3d at 1359; *see also Fina Oil & Chem. Co. v. Owen*, 123 F.3d 1466, 1473 (Fed. Cir. 1997) ("[T]o be a joint inventor, an individual must make a contribution to the conception of the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention."). Further, the person seeking to be named joint inventor must demonstrate that he acted *jointly* with the named inventors.

> [T]he alleged joint inventor seeking to be listed on a patent

- 11 -

must demonstrate that his labors were conjoined with the efforts of the named inventors. Joint inventorship . . . can only arise when collaboration or concerted effort occurs—that is, when the inventors have some open line of communication during or in temporal proximity to their inventive efforts:

"What is clear is that the statutory word 'jointly' is not mere surplusage. For persons to be joint inventors under Section 116, there must be some element of joint behavior, such as collaboration or working under common direction, one inventor seeing a relevant report and building upon it or hearing another's suggestion at a meeting."

*Eli Lilly*, 376 F.3d at 1359 (quoting *Kimberly-Clark Corp. v. Procter & Gamble Distrib. Co.*, 973 F.2d 911, 917 (Fed. Cir. 1992)). Absent an allegation that the putative inventor acted in conjunction with the named inventors, any claim under section 256 must necessarily fail.

Although the Second Amended Complaint alleges Giunti "contributed to the conception of one or more claims" on Defendants' patents (Doc. 46 ¶¶ 156, 177), the Complaint is utterly bereft of allegations that Giunti acted in conjunction with the individuals named as inventors on those patents. Instead, Blackhawk argues that Giunti (and, through the Assignment Agreement, Blackhawk itself) has standing to seek correction of inventorship on Defendants' patents based solely on his having invented QuickTicket, a concept allegedly incorporated into Defendants' patents. (Doc. 63 at 18–20.) But "inventing something in an earlier patent or patent application does not automatically make one an inventor of patents that incorporate the earlier invention." *Horizon Medicines LLC v. Alkem Labs. Ltd.*, No. 2021-1480, 2021 WL 5315424, at *4 (Fed. Cir. Nov. 16, 2021). There must also be "corroborated collaboration" between the putative inventor and the inventors named on the challenged patent. *Id.* Indeed, because "the inventors as named in an issued patent are presumed to be correct," *Eli Lilly*, 376 F.3d at 1358 (quoting *Hess v. Advanced Cardiovascular Sys., Inc.*, 106 F.3d 976, 980 (Fed. Cir. 1997)), the party "alleging misjoinder or non-joinder of inventors must meet the heavy burden of proving its case by clear and convincing evidence and must provide evidence to corroborate the alleged joint inventor's conception" and collaboration with the named inventors. *Id.* at 1359. Because the Second Amended Complaint contains no allegations of

such collaboration, there is no legal basis for Giunti to be named as an inventor on Defendants' patents. *Horizon*, 2021 WL 5315424, at *4. Thus, Blackhawk cannot plausibly allege that Giunti has a "concrete financial" or "reputational" interest in Defendants' patents such that he would have standing to bring section 256 claims against Defendants. Blackhawk's argument that it has standing based on the Assignment Agreement therefore fails *a fortiori*.

### 2.      Blackhawk Employees

Blackhawk also argues it has standing to assert its section 256 claims on behalf of one or more of its employees. (Doc. 63 at 20.) Defendants respond that Blackhawk's claim that one or more of its employees contributed to the conception of the 561 and 812 Patents is merely a "vague and implausible allegation," because "the sole aspect of the [561 and 812 Patents] that supposedly supports Blackhawk's inventorship claims are Numbered Draw Tickets, which is a concept Blackhawk purports to own by virtue of the [135 and 894 Patents] for which Mr. Giunti, not any Blackhawk employee, is the sole named inventor." (*Id.* at 9–10.) Defendants are right. Blackhawk has not alleged facts sufficient to support its contention that one or more of its employees contributed to the inventions claimed in the 561 and 812 Patents. The Second Amended Complaint contains only three cursory allegations regarding Blackhawk employees' contributions to the claims of the 561 and 812 Patents:

1. "[Blackhawk employee] Mr. Koop . . . disclosed the operation of the QuickTicket products to [L3] employees." (Doc. 46 ¶ 150.)

2. "[O]ne or more Blackhawk employees contributed to the conception of one or more claims of [the 561 and 812 Patents]." (*Id.* ¶¶ 156, 177.)

3. "[Giunti] worked collaboratively with one more Blackhawk employees, including Ryan Koop, to design the QuickTicket products." (*Id.* ¶¶ 165; 186.)

These conclusory allegations fall well short of plausibly alleging that Blackhawk has standing to pursue claims under section 256 on its employees' behalf. *See Twombly*, 550 U.S. at 558–59 (allegations must state a claim that is "plausible on its face"). Although

the Second Amended Complaint contains the general allegation that one or more Blackhawk employees contributed to QuickTicket's invention, it fails to specifically identify any employee's purported contribution or describe the manner in which any employee "worked collaboratively" with Giunti to develop QuickTicket. *See In re Gilead Sciences Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (courts need not accept "conclusory" allegations, "unwarranted deductions of fact, or unreasonable inferences"). Simply stating that Blackhawk employees contributed to QuickTicket's invention, without more, is insufficient to plausibly allege Article III standing. *See Spokeo*, 578 U.S. at 338 ("Where, as here, a case is at the pleading stage, the plaintiff must clearly allege facts demonstrating each element [of standing]."). And, as Defendants note, Blackhawk's allegations that its employees helped invent QuickTicket are implausible given that Blackhawk's own patents (the 434, 135, and 894 Patents), which allegedly claim QuickTicket, name only Giunti as inventor. (Doc. 69 at 4–5.) Had one or more Blackhawk employees indeed contributed to QuickTicket's invention, Blackhawk would seemingly have named them as inventors on their filed patents, as the Patent Act requires. *See* 35 U.S.C. § 115(a) ("An application for patent . . . shall include, or be amended to include, the name of the inventor for any invention claimed in the application."). Blackhawk's failure to do so belies its argument that section 256 standing obtains based on its employees' inventorship. Further, even had Blackhawk employees worked collaboratively with Giunti to develop the QuickTicket concept, Blackhawk would yet lack standing because, as with Giunti, there is no allegation that the employees collaborated with the inventors named on the challenged patents.[5] Thus, as a matter of law, they cannot be named joint inventors on Defendants' patents. *See Eli Lilly*, 376 F.3d at 1359.

Moreover, even were the Court to conclude that the Second Amended Complaint plausibly alleges Blackhawk employees contributed to the claims set forth in the 561 and

---

[5] Despite Blackhawk's argument to the contrary, the mere fact that Koop disclosed QuickTicket to L3 employees in no way suggests that he contributed to the inventions claimed in Defendants' patents. *See Eli Lilly*, 376 F.3d at 1359 (holding that, to be an inventor with standing to bring a section 256 claim, the alleged inventor must have "contribute[d] to the conception of the claimed invention.").

1    812 Patents, and worked collaboratively with the inventors named on those patents, the

2    Complaint contains no allegation that the employees assigned their putative rights in

3    Defendants' patents to Blackhawk. Absent such an allegation, Blackhawk is unable to

4    demonstrate that *it* has a concrete interest in the Patents, even if its employees do. *See*

5    *Shkolnikov*, 2011 WL 4804870, at *5 ("Whether an employer has standing to assert a

6    Section 256 claim and have its employee named an inventor of a patent often turns on

7    whether the employee has assigned his putative ownership rights in the patent to the

8    employer."); *Armor Screen Corp. v. Storm Catcher, Inc.*, No. 07-cv-81091, 2008 WL

9    5746938, at *10 (S.D. Fla. Nov. 10, 2008) (finding employer lacked standing to assert

10   Section 256 counterclaim on behalf of non-party employee where the employee had not

11   assigned the employer his rights in the patent). Thus, Blackhawk cannot plausibly assert a

12   concrete interest in the 561 and 812 Patents based on its employees' alleged inventorship,

13   and the Court lacks subject matter jurisdiction over Blackhawk's section 256 claims.

### B.    Breach of Contract Claims

15          Defendants also argue the Court lacks jurisdiction over Blackhawk's surviving

16   state-law claims. (Doc. 58 at 10–11; Doc. 59 at 6–7.) Blackhawk responds that (1) the

17   Court has supplemental jurisdiction over the state-law claims because those claims form

18   part of the same case or controversy as the section 256 claims (Doc. 63 at 16), and (2) even

19   if the Court lacks supplemental jurisdiction over the state-law claims, it has original

20   jurisdiction over them, because they arise under federal patent law (Doc. 63 at 14).

21          Because the Court has determined that it lacks original jurisdiction over

22   Blackhawk's section 256 claims, those claims cannot serve as a jurisdictional anchor for

23   Blackhawk's breach of contract claims. *See* 28 U.S.C. § 1367(a); *Larson*, 569 F.3d at 1325

24   ("[I]f the jurisdiction-conferring patent claim is dismissed for lack of standing, the district

25   court cannot exercise supplemental jurisdiction over surviving state-law claims because

26   there was never an Article III case or controversy."); *Salmon Spawning & Recovery All. v.*

27   *U.S. Customs & Border Prot.*, 550 F.3d 1121, 1133 (Fed. Cir. 2008) ("[S]upplemental

28   jurisdiction cannot be exercised when a court does not have original jurisdiction over at

least one claim in the suit."). Thus, for Blackhawk to proceed on its state-law claims, those claims must have an independent jurisdictional basis. Blackhawk argues that they do, and that the claims come within the Court's original jurisdiction, because they "arise under" federal patent law. (Doc. 63 at 14–15.)

Federal courts have exclusive jurisdiction over all suits "arising under any Act of Congress relating to patents." 28 U.S.C. § 1338(a). A case can "arise under" federal patent law in two ways. *Gunn v. Minton*, 568 U.S. 251, 257 (2013).[6] First, a case arises under the federal patent laws when those laws create the cause of action asserted. *Id.*; *see also Am. Well Works Co. v. Layne & Bowler Co.*, 241 U.S. 257, 260 (1916) ("A suit arises under the law that creates the cause of action"). This is commonly referred to as the "creation" test. Second, "even where a claim finds its origins in state rather than federal law," the Supreme Court has "identified a 'special and small category' of cases in which arising under jurisdiction still lies." *Gunn*, 568 U.S. at 258. The contours of this category have not always been clear. *Id.* ("In outlining the contours of this slim category, we do not paint on a blank canvas. Unfortunately, the canvas looks like one that Jackson Pollock got to first."). In 2013, however, the Court clarified that "federal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress. *Id.* (citing *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314 (2005)).

Analyzed under this standard, it is clear that Blackhawk's state-law claims do not "arise under" the federal patent laws for purposes of § 1338. Even assuming the claims necessarily raise a federal patent law issue, and the issue is actually disputed, the Court lacks jurisdiction because the issue is not "substantial" in the relevant sense. The substantiality inquiry is focused not "on the importance of the issue to the plaintiff's case

---

[6] For a reason unknown to the Court, the parties' briefs both fail to mention, much less argue, *Gunn*, the Supreme Court's recent (and controlling) case addressing arising-under jurisdiction in the context of § 1338. Instead, the parties' briefs cite primarily Federal Circuit cases predating (and in some instances explicitly invalidated by) *Gunn*. E.g., *Air Measurement Techs., Inc. v. Akin Gump Strauss Hauer & Feld, L.L.P.*, 504 F.3d 1262 (Fed. Cir. 2007).

and to the parties before it," but rather on "the importance of the issue to the federal system as a whole." *Id.* at 260 ("[I]t is not enough that the federal issue be significant to the particular parties in the immediate suit; that will always be true when the state claim 'necessarily raise[s]' a disputed federal issue." (second alteration in original)). The patent law issues implicated in this case carry no such significance. *Id.* at 261.

In *Gunn*, the petitioner, Minton, had his patent declared invalid in federal district court under the "on sale" bar, 35 U.S.C. § 102(b), which prevents an inventor from obtaining a patent on an invention that was "on sale in [the United States], more than one year prior to the date of the application." *Gunn*, 568 U.S. at 254. Minton believed his attorneys' failure to timely raise an "experimental use" argument cost him the suit and his patent.[7] *Id.* at 255. Accordingly, he sued his former attorneys for legal malpractice in Texas state court. The causation element of Minton's malpractice claim required the Texas court to adjudicate a "case within a case" involving the experimental use exception. The court ultimately held in the attorneys' favor on the merits, and Minton appealed. On appeal, he argued that because his malpractice claim was based on an alleged error in a patent case, it "arose under" federal patent law for purposes of § 1338 and was subject to the exclusive jurisdiction of the federal courts. *Id.* at 255.

The Supreme Court disagreed. Although the state malpractice claim necessarily required application of federal patent law, and although the patent issue was actually disputed, the Court held that the federal issue in the case was not "substantial" with respect to the federal system as a whole. *Id.* at 259–60. The Court gave several reasons for this conclusion. First, allowing the Texas court to resolve the patent issue would not "undermine the development of a uniform body of patent law," because "federal courts are of course not bound by state court case-within-a-case patent rulings." *Id.* at 262. Second, even if a novel question of patent law arose in the state court proceeding, it would still "at some point be decided by a federal court in the context of an actual patent case,

---

[7] The "experimental use" exception permits "an inventor who seeks to perfect his discovery [to] conduct extensive testing without losing his right to obtain a patent for his invention." *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 64 (1998).

with review in the Federal Circuit." *Id.* Third, even if the state court's adjudication was "preclusive under some circumstances, the result would be limited to the parties and patents that had been before the state court." *Id.* at 263. Fourth, that the federal courts are more familiar with patent law does not mean all state-law cases raising patent law issues belong in federal court. "[T]he possibility that a state court will incorrectly resolve a state claim is not, by itself, enough to trigger the federal courts' exclusive patent jurisdiction, even if the potential error finds its root in a misunderstanding of patent law." *Id.*

Consistent with the Supreme Court's holding in *Gunn*, the Federal Circuit has adopted a three-factor framework to inform the substantiality determination. *See Inspired Dev. Grp., LLC v. Inspired Prod. Grp., LLC*, 938 F.3d 1355, 1364 (Fed. Cir. 2019); *NeuroRepair, Inc. v. The Nath Law Grp.*, 781 F.3d 1340, 1345 (Fed. Cir. 2015).

> A substantial federal issue is more likely to be present if:
>
> a) a pure issue of federal law is dispositive of the case,
>
> b) the court's resolution of the issue will control numerous other cases, [and]
>
> c) the Government has a direct interest in the availability of a federal forum to vindicate its own administrative action.

*Inspired Dev. Grp.*, 938 F.3d at 1364 (cleaned up). Each of these factors—commonly referred to as the "*NeuroRepair*" factors—counsels against the exercise of federal jurisdiction in this case.

Blackhawk argues its breach of contract claims "arise under" federal patent law because § 10 of the Distribution Agreement prohibits the use or sale of Blackhawk's "intellectual property," which is defined to include "patents, patent rights, copyrights, trade secrets, [and] trademarks," among other things.[8] (Doc. 47 at 13.) Therefore, determining whether Defendants breached § 10 of the parties' Agreement necessarily requires

---

[8] While the Second Amended Complaint also alleges that Defendants breached § 8 of the Distribution Agreement, which prohibits the use of Blackhawk's confidential information, Blackhawk does not argue that resolution of that claim necessarily involves substantial questions of patent law. Instead, Blackhawk appears to argue that because the Court has original jurisdiction over its claim involving § 10 of the Distribution Agreement, the Court has supplemental jurisdiction over its remaining state-law claims and its section 256 claims. (Doc. 63 at 16.)

comparing Blackhawk's patents and intellectual property to Defendants' patents and intellectual property—an analysis involving the application of federal patent law.[9] (Doc. 63 at 15–16.)

First, the patent law issue embedded in the § 10 claim is not dispositive of whether Blackhawk is entitled to relief. Rather, the claim "involves a question of federal law, at most, as only one of several elements needed to prevail." *Inspired Dev. Grp.*, 938 F.3d at 1364 (quoting *NeuroRepair*, 781 F.3d at 1346). To succeed on the § 10 claim, Blackhawk must also prove that the Distribution Agreement is valid and controlling on Defendants (particularly Defendants ICI and e2, who were not parties to the Agreement), and that Defendants alleged use of QuickTicket constitutes an impermissible "use" under the Agreement. Should Blackhawk fail to do so, it will not prevail on its § 10 claims. Accordingly, the first *NeuroRepair* factor weighs against § 1338 jurisdiction.

Second, to the extent Blackhawk's breach of contract claims raise an embedded patent issue, adjudication of that issue, as in *Gunn*, will take the form only of a "case within a case." Regardless of how a state court may ultimately resolve this hypothetical "case within a case," its decision will have no real-world impact on the validity, scope, or ownership of the parties' patents. *See Gunn*, 568 U.S. at 261; *see also Inspired Dev. Grp.*, 938 F.3d at 1365 ("[A] state court cannot invalidate patents. . . . [A] state court's determination of patent validity does not have precedential effect on a district court."). Thus, although determining whether Defendants breached § 10 of the Distribution Agreement may require assessment of whether the subject matter claimed in the 561 and 812 Patents was claimed previously in the 135 and 894 Patents, there is little to suggest a state court's hypothetical analysis on this issue will affect "uniformity in patent law." *See Inspired Dev. Grp.*, 938 F.3d at 1364, 1366; *see also Gunn*, 568 U.S. at 261–62 ("Congress ensured such uniformity by vesting exclusive jurisdiction over actual patent cases in the federal district courts and exclusive appellate jurisdiction in the Federal Circuit. In

---

[9] Blackhawk did not make this jurisdictional argument in the Complaint. Instead, the Complaint alleges only that the breach of contract claims are justiciable as an exercise of the Court's supplemental jurisdiction. (Doc. 46 ¶ 26.)

resolving the nonhypothetical patent questions those cases present, the federal courts are of course not bound by state court case-within-a-case patent rulings."). Further, Blackhawk's breach of contract claims do not present novel questions of patent law that could impact other cases. *Inspired Dev. Grp.*, 938 F.3d at 1366; *see also Gunn*, 568 U.S. at 262 ("If the question arises frequently, it will soon be resolved within the federal system, laying to rest any contrary state court precedent; if it does not arise frequently, it is unlikely to implicate substantial federal interests.").

Third, "the government has no direct interest in this contract dispute between private parties." *Inspired Dev. Grp.*, 938 F.3d at 1368–69. The embedded patent law issues implicated in this case are "fact-bound" and case specific; they involve comparing the claims of four particular patents to determine whether this particular invention was impermissibly used by these particular Defendants. The government's particular interest in having this case—or any other single patent action—heard in a federal forum is limited. *Id.* at 1369. Thus, the final *NeuroRepair* factor also favors dismissal.

"There is no doubt that resolution of a patent issue in the context of a state[-law breach of contract] action can be vitally important to the particular parties in that case. But something more, demonstrating that the question is significant to the federal system as a whole, is needed. That is missing here." *Gunn*, 568 U.S. at 263–64. Absent such federal significance, this Court lacks subject matter jurisdiction over Blackhawk's state-law claims. Dismissal under Rule 12(b)(1) is warranted.

**IV.    CONCLUSION**

Accordingly,

**IT IS ORDERED granting** Defendants' motions to dismiss for lack of subject matter jurisdiction (Docs. 58, 59), without leave to amend.

//

//

//

//

**IT IS FURTHER ORDERED** directing the Clerk of the Court to enter judgment and close this case.

Dated this 9th day of March, 2022.

Michael T. Liburdi
United States District Judge